Case number 23-1301, Kathleen Liebau v. Dykema Gossett PLLC, arguments not to exceed 15 minutes per side, Mr. Farrar, you may proceed for the appellate. Good afternoon, your honors. I'd like to request three minutes for rebuttal. Would you pronounce your client's name? Liebau. Liebau, thank you. Thank you, your honor. May it please the court, the plaintiff appellant, Kathleen Liebau, was a 35-year employee at the law firm Dykema Gossett. And just to put that into perspective for the court, Dykema hired her when she was a teenager and fired her when she was in her 50s. It's the only job she's ever known. Now, Dykema claims that it fired Ms. Liebau for various, and I would submit vague and certainly subjective reasons, such as those outlined in her termination letter. For instance, not maintaining respectful conduct. When reviewing this case, I'd ask the court to consider this question. What changed? Would a reasonable jury find it credible to believe that this long-term employee who always had very good performance reviews during the course of her lengthy career, and certainly someone who would not have lasted over three decades at a well-known, well-respected law firm such as Dykema, had she not been a good performer? Would a reasonable jury find it credible to believe that she suddenly stopped communicating with her colleagues in a professional manner, and that her performance somehow, all of a sudden, fell off a cliff? Respectfully, I submit the answer to that is no. So it gets back to the question, what changed? What the evidence has shown is that these alleged performance problems all began, or at the very least came to a head, once Ms. Liebau was assigned to report to an attorney who had openly and publicly mocked her due to her age. In its decision, the district court found that the evidence here supports an inference of discrimination. I was in the district court's opinion. And throughout its briefing, and at the district court level, Dykema never defends the behavior of this attorney supervisor. They never attempt to explain her age-based... She's not a decision maker, is she? Well, Your Honor, that's in dispute. She testified, and by she I'm referring to the attorney, Chelsea Larson, she testified that at one point she was considering whether to terminate the plaintiff. But that statement in the depot, you're talking about the paragraph at the beginning of the thing, she says it wasn't my decision, I don't have anything to do with it. I mean, I think if we've not... And there doesn't seem to be any evidence, other evidence, that she was a decision maker. I mean, she was a supervising attorney, but it didn't look like she had the authority to fire a staff member. Well, Your Honor, I'd ask that when that statement is read in context together, and I acknowledge she said it's not her decision, she also said she was considering whether to fire her. I believe a reasonable jury... I believe that really comes down to credibility, and a reasonable jury could find her... Is it credibility, or is it just... I mean, number one, I think the context of the statement hurts you. I think you need to take that one sentence and say, I decided to decide whether to terminate or whatever, and say, see, she says terminate, as opposed to the entire rest of the paragraph, which suggests to me that she didn't have any authority. And then, there doesn't seem to be any other evidence that she was a decision maker. I mean, this Coma or Choma, I don't know how you pronounce it, but she seems to be the one, she's the head of the office, right? She seems to be the one that would oversee staff, and would be the one that made the decisions, right? Well, Your Honor, I think the reality of how law firms operate is that the personnel decisions like this are generally made by attorneys. And I believe there was an example... I don't know... I worked at a law firm, and I saw staff members get fired all the time. The attorney was like, where's my secretary? Oh, they fired her. Like, oh yeah, what'd she do? I mean, I don't know, maybe that's right, it's not been my experience. It's not that that's relevant here or there, but I guess what I'm... But my main question is this. If she's not a decision maker, what do we do with... We have some case law that suggests that, at least when we look at a prima facie case, the non-decision maker's statements are really not relevant. You have to have some discriminatory indicia from somebody who's a decision maker, right? Well, I believe the case law, and we certainly cited some in our briefing, that statements, even by non-decision makers, can be probative of a discriminatory environment. And we certainly have that here. There's significant discrimination that occurred, certainly mockery towards her age, and... Is there any evidence that the decision maker participated in any of this, or knew about it, or was there with the party, or whatever? I don't... I'm trying to figure out why... A discriminatory atmosphere at the law firm that involved the decision maker? Like, she was part of it, or... I guess I'm not seeing the link. Well, assuming that Ms. Shulman was the only decision maker for the moment, that would fall under what we've alleged is the cat's paw theory of liability here. And there's no dispute, and it was even acknowledged in the district court's opinion, that Ms. Larson influenced Ms. Shulman's decision to terminate the plaintiff, based on the numerous complaints that she would forward to Ms. Shulman, almost on a daily, certainly weekly basis, that had no basis in fact, and that Ms. Lebeau has rebutted. Certainly... I thought that she... Well, first of all, I'm curious that you say that she influenced the decision. I thought the cat's paw case is like, you basically have to rubber stamp something that somebody... Like, it's a puppet master, or whatever. Like, I'm just rubber stamping some recommendation. And it seems to me that the office manager, Shulman, I mean, she had this meeting with the two of them, she fills out an evaluation, I mean, she's a supervisor, and it doesn't seem like she's a rubber stamp. Am I wrong about that? If you look at... She had almost no first-hand knowledge, Your Honor, of the plaintiff's day-to-day job quality or the performance of her work. And she acknowledges that. She even testified that on only a handful of occasions over the last several years did she ever personally observe plaintiff working. So all of this information is coming from Chelsea Larson, the one who had mocked plaintiff's age. And that's, I think, a very important point. And the Madden case that we cited, I believe in our reply, talks about the discriminatory flow of information as being relevant to the cat's paw analysis. And we submit that's what we have here. We have a constant flow of negative, unwarranted performance criticism of the plaintiff that certainly influenced Ms. Shulman and caused her to make the decision to terminate the plaintiff. Where do you place the events that Shulman was familiar with? Say, the meetings at which, I think it was a meeting at which the three of them were together and Shulman was present. Does that make any difference? Well, I would note for the Court that those meetings all were... they took place because of Ms. Larson's complaints about the plaintiff. There would not have been these meetings had it not been for Ms. Larson conveying this constant negative criticisms of the plaintiff. So I think that's important for context as to what was really happening at these meetings. And the things Ms. Shulman allegedly has personal knowledge of, such as the plaintiff's tone and demeanor at these meetings, certainly there's evidence that Ms. Shulman's account is not accurate. And there's even testimony that Ms. Larson never found the plaintiff to be inappropriate and that she had communicated at those meetings that Ms. Shulman's claims resulted in her termination in a manner that was consistent with how Ms. Lebeau has conducted herself professionally for many, many years, which we would submit raises a question for a jury as to whether that would be a protectual reason, given that this is how she has always conducted herself. Since I have just a couple minutes left, I also want to turn to the allegation of retaliation. I think there's some perhaps confusion in the brief in terms of the timing here. The plaintiff had repeatedly raised complaints about the wheelchair being left next to her workstation to mock her. And I would submit that that alone could be deemed protective activity, given the connection between the wheelchair and her age. It was not left there by accident. This was not a generic complaint of a wheelchair. There's no dispute why it was there. It was there to mock her because of her age. And when she's complaining that she wants the wheelchair removed, when co-workers are telling her it makes you look old and feeble, that should be, I'd submit, would be protective activity. Additionally, even setting that aside, at an April 30, 2019 meeting, which was, I believe, nine days before the plaintiff was placed on probation for these alleged performance issues, she pondered whether she needed to hire an attorney. And again, I would submit... That was to Larson, right? To Larson and Ms. Joma. It was a meeting they both attended. And then several days after, Ms. Joma placed the plaintiff on probation. I would submit that that would be protected activity. And there was some discussion in the briefs about whether... She was put on probation after she didn't do the conflict check she was asked to do. And the plaintiff explained, Your Honor, why that was not the case. And there's certainly testimony providing what I believe a reasonable jury would find, a reasonable explanation for her action. She had reached out to Ms. Larson asking for direction on the conflict check, never got a response. Instead, Ms. Larson forwarded an incomplete email exchange to Ms. Joma on that issue. So we'd submit that that certainly could be other evidence of pretext. And additionally, even setting aside the wheelchair complaints, the April 30th request for an attorney, June 19th, I believe it was June 18th, June 19th, she also complained directly to Ms. Joma that Ms. Larson was discriminating against her based on her age. That was two months before she ultimately was terminated. And certainly we believe... That was the meeting that Joma ended because Lebo had used what she considered inappropriate language, calling Larson honey and calling Joma honey? I believe that was the... Is that meeting right? I believe that was the meeting. And I would note, too, for Your Honor, that that was when Ms. Larson responded that she never felt offended and understood Lebo's use of the word honey as being consistent with how she had communicated. That's who she is. Correct. Correct, Your Honor. And I see that I'm out of time here. But if the Court has no further questions at this time. No further rebuttal. Okay, thank you. May it please the Court, David Porter here on behalf of FLE Daikoma Gossip. I'd like to start with what I think is the central issue in the case, and that is the decision-maker. And the concept of decision-maker, it's an important concept in employment discrimination cases because the crucial question in every case is, what was the reason for the particular employment decision at issue? Was it a legitimate business reason or was it motivated by some animus toward a protected class or characteristic that the plaintiff has? Well, if Larson was not the decision-maker, if she had been the decision-maker, you would concede that her actions showed discriminatory intent, wouldn't you? The analysis would certainly be different, absolutely. But that's not the facts that we've had here. And there has never been an allegation, at least down in the district court, that Larson ever held any decision-making authority. She has always disclaimed that, as has Choma. But that's the core of a cat's paw argument. It's when a non-decision-maker has influence over a decision-maker to implement her will, right? So what plaintiff is talking about is two different things. One, Larson may be the decision-maker. She may have actually had that authority, and they try to take one isolated sentence out of her deposition to claim that there's a question of fact, and maybe she actually was the decision-maker, despite all of the other proof in the record that nobody ever thought that she was, not even she herself. She wasn't even involved in the decision. I think we can put that to one side. So then, now what we're really talking about is a cat's paw theory. And she herself testified that she never even knew about the decision, that termination was even contemplated. And that's the irony of plucking out that one sentence from Larson's testimony, because right after that, she says, Termination wasn't even on my mind. What I was thinking about doing is trying to find another place for her, either in the project or somewhere else. Even Geis had come to her. He is the more senior attorney on the litigation team, and had suggested, should we just get rid of her on the project? And she came back and said, No, give me another opportunity. Let me keep working with her. So she had to suspect once she went on probation, once she didn't. So she doesn't do the conflict check, and Larson sends an email and says, FYI, essentially this is insubordinate behavior. She doesn't think termination is even a possibility at any point? I mean, at that point, you're thinking, well, look, it's going to be on the table, right, at some point? Or you're saying, no, she's sending this stuff maybe to get her off her team, but doesn't want her fired from the firm? Not even that. Not even to get her off the team. This is what Larson, Geis, all the other attorneys in the firm are required to do. They are required to pass on performance-related information to their direct supervisor. In the case of Ms. LeBeau, it's Susan Choma. Susan Choma is the one who collects all of these reviews, both during the year and at the annual review process. There's no dispute that Clay Geis' reviews were always good, right? Well, there is a dispute about that. In fact, beginning as early as 2017, he begins noting she is resistant to other people's views. She needs to do a better job of listening to Ms. Larson. Yes, but that's in the context of an overall very positive review, is it not? Correct. And that's also the sort of the misunderstanding that I think that Ms. LeBeau has of the record and the reason for her termination. Nobody has ever accused Ms. LeBeau of not being good at the hard skills, the sort of the substance of her work. She's very good at inputting data into an Excel spreadsheet. But there is more to her job than just hard skills. You have to be able to work well with others. You have to be able to take constructive criticism, take direction. And she couldn't do that, especially with respect to Sue Choma, who began working with her as early as 2017 on her timekeeping infractions, working from home, arriving late. But Choma said that she pretty well conquered those problems, right? Well, she had, yes. And by early 2018, well, the memo notes that after they met, she continued to violate that policy. But her annual review in 2019 does show that there has been some improvement in that area. But again, ramped back up in mid to 2019 when she again doesn't get an overall glowing review. It's something that she thinks in her mind is a negative review, which really on panelists was a good review. It wasn't great, but it also wasn't very bad. And she then starts raising these concerns, well, maybe I need to get an attorney. And nobody knew what that meant, but it's shortly after that. Well, I say they're attorneys. They should have had a pretty good idea of what that meant. Well, there is no evidence in the record that anyone understood that to be anything relating to an age discrimination complaint or anything like that. Larson reported it to Choma, and that was smart. That's exactly what an attorney should have done. If an employee says to that supervising attorney, I think you're going to fire me, and maybe I ought to get an attorney. Any attorney worth her stock is going to immediately report that as a threat of an age discrimination complaint. I think any mid-level manager worth their stock is going to report that to the person who is involved in directly supervising that person because there's obviously a concern with the employee about their performance. No action was ever taken in response to that meeting. What does happen, though, is immediately after that she begins to be directly insubordinate to Ms. Larson with respect to the conflict check. And I know I don't need to explain the significance and the importance of what a conflict check is, but it was directly insubordinate. And it wasn't some negative flow of information that Larson provided and that Choma didn't have an appreciation for or couldn't verify. Plaintiff admitted that she was told to do this and that she didn't do it. And then when she didn't do it, that she was told by Larson, go ask Clay Geis for that information, and she still didn't do it and left it for another support staff. So this idea that there's a negative flow of information coming from Ms. Larson that is going unchecked or uninvestigated by Ms. Choma is simply not true. She investigated all of these. She reviewed the emails that documented this. And she also saw firsthand a sort of course of unprofessional and disrespectful conduct both towards Larson and herself. She was present at the June 18th meeting. She was also present at a lot of other counseling meetings involving her timekeeping infractions. Ms. LeBeau admitted having an outburst towards Ms. Larson in June. That's when Ms. Larson found out that she was on probation to begin with. So the idea that Choma is some unthinking dupe is just not backed up by the record. And I think to say otherwise misstates the record. And what is the possibility that you have a 35-year employee who is a long-term employee and probably up until we began to see some of these things occur, a recipient of very good recommendations and annual reviews. What is to be taken relative to age discrimination that when she's been there 30 years and now she's 55 or so, people are beginning to ask her about when she's going to retire. And then you have some honestly insubordinate and not very pleasant conversations with Larson. Larson herself says this is who this woman is, I get it. But now it's worthy of termination. Is that some sort of indicia that age was in fact part of the problem? No, because the retirement inquiries weren't from the decision maker, Sue Choma, they came from Larson. I would imagine Sue Choma had a very good idea what was going on if she was in an organization that was giving this woman a 50th year birthday party in which you bring balloons and cakes and diapers and wheelchairs. Sue Choma first learned about that birthday incident on June 18, 2019. That was the first time that she was aware that that went on in the business and to the people over whom she was the supervisor? Yes, that was the first time that Ms. Lebeau made any complaint about that. I'm not asking you about whether she made a complaint. I'm asking you about whether Choma knew that event occurred. How could she not? That was a regular occurrence. Ms. Lebeau was not the first person to have their desk decorated and to have somebody's milestone birthday celebrated at the firm. That's absolutely true. It happened for Clay Geis, it happened for Chelsea Larson herself. She was not out of the norm for this to happen and it was a good faith gesture. We've been accused of not trying to justify any of these actions. We're at the summary judgment stage and we're not here to fight any of the inferences that are being drawn by plaintiff from these. The important part is that the inquiries about retirement, that birthday gag, they were not done by Sue Choma. The inquiries were not made by Sue Choma. Sue Choma didn't even know about the retirement inquiries herself. She first learned about Kathleen Lebeau's complaints about the birthday party until June of 2019. There was simply no connection between those comments and the decision maker. The only way that this could even be potentially relevant to the prima facie analysis is if it was so bad that it created some discriminatory atmosphere in the firm around the other managers that it somehow sort of infused or influenced the decision making process. That's the Riesch cake, that's the Goodyear tire case. That argument was not made below. I think that if it's a cat's paw case though, that as long as we're going to have a cat's paw theory, why wouldn't it be true that the non-decision maker's statements or animus could be imputed to the decision maker at the prima facie stage too? Yeah, that's just another way of analyzing this entire case. It stands in the place of the prima facie case. You think that's right? You can? Well, the question is now you have to think about it in the cat's paw analysis and was there an attempt? I'm saying that we have these cases that say a non-decision maker, we have a couple of cases that say a non-decision maker's discriminatory statements or whatever are irrelevant at the prima facie stage, right? Am I overstating that? Then we have cases like Goodyear that say no, they are relevant to show that there's some kind of discriminatory atmosphere or something. What I'm saying is none of those cases seem to address where the plaintiff is saying, I have a cat's paw theory. So in my case, it's not like any of those cases. This case, because I have a cat's paw theory, it should be relevant at the prima facie stage. Yes, I think you're right about that. It goes to the question that you asked about, well, what if Larson was the decision maker? I don't think there would be any dispute that her actions, her conduct, would create an inference of discrimination if she was the decision maker. So now we're going to, if we ask, well, if she's not actually the decision maker, was she influencing or recommending somebody to take an adverse action? There is no evidence that she influenced, contrary to opposing counsel's statement. The district court did not hold that. In a different context, she said that, yes, Larson had an effect on the ultimate decision, but she said that in the context of the EEOC versus Ford case, the same way that the manager had an effect on the ultimate decision there, and yet this court, a non-BAC decision, said, no, this person doesn't qualify as a decision maker for purposes of analyzing whether or not we can impute the discriminatory animus to that person. We don't define decision maker at that high level of generality. So the district court did not find, in fact, she found just the opposite, that there was no influence between Ms. Larson and Sue Choma, and even if there were, it takes two to pull off a cat's paw theory, and again, Sue Choma was not an unthinking dupe. She vetted everything that was provided to her, and she did see a lot of this firsthand. She observed the unprofessional conduct. Yes, she wasn't sitting at her desk analyzing what she was putting in the spreadsheet every day, but she did see the way that she interacted with her attorney colleagues. She received that information on an annual basis. She knew exactly the type of employee she was as it related to those soft skills. I guess I'm just struggling a little bit about knowing exactly the type of employee she was because it seems to me that there might have been, under the facts of this case, some changes in her employment actions as she aged, maybe, or as she moved to Larson as opposed to Mr. Geis, and I find it a little bit surprising that there were no steps in a big entity like this to place her in another location since they had, in fact, talked about that earlier, which is sometimes part of the issue. They did try to put her in a different spot. I thought they were talking about that, and then Larson, who without question has some discriminatory animus, said, no, I'll find a place for her over here. Let me take you back to before the new project started where she began to work with Larson. Right before that, a long-term project with Clay Geis came to an end. He forecasted that and said, this is going to come to an end. You need to then start thinking about other ways to keep yourself busy. Sue Choma visited her and said, look, you need to start thinking about how to reinvent yourself here at the firm because you're about to lose this very long, lucrative project that you've been working on, and she showed no interest in doing that. They tried to transfer her or put her in the Detroit office for a temporary time so that she could provide some fill-in services for somebody who was on medical leave, and she complained so loudly on the first day that she was sent back to the Bloomfield Hills office because the other staff couldn't work with her. So she sat idle for months until then this new project came in and they were able to find a spot for her there at the firm. So they did everything they could to find her some work that was suitable to what she was good at. She was good at what she was doing, but she just could not take direction from those whose job it was to provide it, and that was both Chelsea Larson and Sue Choma. Unless the board has any other questions, thank you. Thank you, Your Honors. May I proceed? Please. I heard Mr. Porter just now acknowledge that the birthday for Ms. LeBeau was not the first time that it happened, and apparently it seems quite common for this type of thing to be going on at the law firm, and I propose if the law firm is recognizing, acknowledging, birthdays with diapers and wheelchairs and pill bottles, it certainly raises a question as to how the firm views and values older workers. DICMA seems to acknowledge a discriminatory inference here can be drawn. I want to address a couple points here. First is regarding Ms. Choma. She did know about the wheelchair, and there's certainly a question of fact as to whether she knew about Ms. Larson's discriminatory animus, but at the very least she knew the wheelchair was there. I believe it would be hard for a jury to believe that after all those years it sat by her desk as a constant reminder that some of Ms. LeBeau's colleagues viewed her as old. Ms. Choma never asked, never looked into that, never had any knowledge at all. So I certainly wanted to raise that issue. I think the record is clear that... Did Ms. LeBeau testify that she had... I know she testified that she had taken the wheelchair back to Larson's office, but there's no testimony that she took it back or met with or called Choma. Is that correct? My recollection of the testimony is that Ms. LeBeau was complaining about the wheelchair and she did complain to Ms. Choma as well about it. That's my recollection. But there were numerous complaints of the presence of the wheelchair. And there's also evidence that it was well known among the office that the wheelchair was there. Everyone saw it when they walked by. And Ms. LeBeau stated that her colleagues even asked her why it was there and if something was wrong with her. So they were obviously aware of its presence. It was no secret that there was a wheelchair by her office that was directly related to this age gag. What's your best fact for saying that LeBeau was pulling the strings, so to speak? You mean Larson? I'm sorry. Larson was pulling the strings about LeBeau's position. I think she knew exactly what she was doing. And if you even look at her testimony, and we cited this on page 15 of our reply brief, she was asked why she notified Sue, Sue Choma, of these issues. She testified because she had been accused of discriminating against Ms. LeBeau because of her age. I don't think it can get much clearer than that. She was accused of discrimination and began forwarding more negative information to Ms. Choma. I think common sense would suggest she did it for a reason. She wanted to create a paper trail so that LeBeau would be terminated and she would have her wish, given the animus that Ms. Larson had expressed so blatantly here. I would also ask you, have you engaged with our mediation department? We have. We did a mediation. Did you have a face-to-face mediation? It was several months ago, my recollection. It was by Zoom. It's something that we routinely would say to clients, if there's a possibility of resolving something, that you have a hand in what makes the resolution that you are willing to accept. It is shorter. It is immediate. It is often wisdom to realize that that's the best resolution to a case. I suggest you consider it again. Thank you, Your Honor. I'm a big advocate of mediation myself and always advise my clients of the benefits of it. At the district court, we did do, I believe, at least two mediations. One was a settlement conference with the assigned magistrate judge. The parties have explored this, I believe, quite thoroughly. Of course, you're in a different position here because you've already lost. Yes, Your Honor. That's a reason to look seriously at, rather than having a decision handed to you, you having a hand in rendering what the decision should be. Understood, Your Honor. I thank you for that. Thank you both. We appreciate your work. There are a lot of facts and a lot of issues in this case, and it will be taken under advisement. It may be a time during that in which you might consider sitting down again and seeing if you can work something out. But if not, in due course, we will render an opinion.